IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| YUVONNE M. PENDELTON, | ) |
| | ) |
| Plaintiff, | )   CIVIL ACTION |
| | ) |
| v. | ) |
| | )   No. 04-2206-KHV |
| THE UNIVERSITY OF KANSAS | ) |
| MEDICAL CENTER, | ) |
| | ) |
| Defendant. | ) |
| _____) | |

## MEMORANDUM AND ORDER

Yuvonne M. Pendelton brings suit against the University of Kansas Medical Center ("KUMC") for race discrimination and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Plaintiff alleges that defendant discriminated against her based on race when it denied her job training which ultimately resulted in unsatisfactory performance evaluations. Plaintiff claims that after two such evaluations, she was forced to retire. The matter is before the Court on defendant's Motion For Summary Judgment (Doc. #29) filed November 1, 2005. For reasons stated below, the Court sustains defendant's motion.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing

law." Anderson, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, Okla., 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on his pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing summary judgment. See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. See Anderson, 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

**Factual Background**

The following facts are either undisputed or, where disputed, construed in the light most favorable to plaintiff.

From May of 1984 until August of 1998, defendant employed plaintiff as a nursing unit clerk in the University hospital. In 1998, the Kansas legislature separated the hospital from the university and created the University of Kansas Hospital Authority. Classified civil service employees at the hospital, such as plaintiff, had the choice of staying in their positions (and leaving the classified service) or being transferred to an available civil service position within the University. On October 5, 1998, plaintiff transferred to an Office Assistant III position with defendant's Office of the Registrar. Plaintiff's job duties included preparing letters and forms for the Registrar to sign or certify in response to requests from students, former students, medical residents, employers and other education institutions.

In September of 2001, defendant reclassified plaintiff's position as "Administrative Specialist." Some of plaintiff's new job responsibilities differed from those of the Office Assistant III position. The record does not reflect how the job responsibilities differed. Plaintiff received some training for added duties, and she performed some additional duties for which she had not been properly trained. Affidavit of Yuvonne Pendelton, Exhibit 1 to Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment ("Plaintiff's Opposition") (Doc. #31) filed November 23, 2005. Plaintiff claims that she requested additional training "on numerous occasions" and the record reveals one detailed request on April 29, 2002. The record contains no specific evidence of other training requests. Despite plaintiff's requests, defendant denied her training for job duties in her new position. See Exhibit 2 to Plaintiff's Opposition (Doc. #31) at 27. Plaintiff further explained, as follows:

> That was the area of enrollment. The screens that I needed to use, the information on the

> screens that I needed to use to do verifications for Allied Health nursing students that I was not familiar with. Most of the job duties that came with the new title was the training that I was denied.

Id. Defendant provided such training to Stephanie McKaig, a younger white employee. See id. at 25, 29.

On December 27, 2001, plaintiff received a disciplinary report for sending a student's transcript to another student. After determining that the mistake involved performance and not conduct, defendant withdrew the report. On May 8, 2002, plaintiff's supervisor, Anne Flaherty, gave her a "Priority Outcome," a form which defendant used to document performance problems and expectations. Flaherty attached an e-mail which summarized her discussion with plaintiff.

> I indicated to you from the time period of April 10 - May 1 . . . I had signed a total of 65 documents . . . for you. Of these 65 documents, there were a total of 16 errors. I indicated to you that you were averaging 4.6 documents completed per day with an accuracy rate of 75%.
>
> We reviewed some of the errors made and found some themes:
>
> 1) Some errors were due to mistakes made with MS Word (templates). Yvonne [sic] will work with Sara Honeck next week to get additional practice on using word to type letters [with] the goal of reducing these types of errors in the future. YuVonne indicated the additional practice would help her as she is more comfortable using a typewriter. In addition, she will work with Sara to create templates to meet the various verification requests (i.e. one for MD verifications, one letter for MD verficiations [sic] requiring program start and end dates as well as graduation dates, etc.). All outdated templates will be removed from YuVonne's computer.
>
> 2) YuVonne indicated she needed to make an increased effort to concentrate when working to reduce errors. In addition, she needs to get in the habit of proofing her own work upon completion.
>
> 3) YuVonne indicated she would talk with her teammates . . . about reducing distractions. This might involve developing a system to direct traffic to a team member when researching verification problems etc.
>
> Based of [sic] the number of errors since the last review period, we agreed that Anne

> would continue to proof YuVonne's work for the next month and we would look at YuVonne's level of accuracy around June 1. Anne will continue to proof all work completed by YuVonne prior to sending out. All work competed by YuVonne must have Anne's original signature.
>
> In addition to accuracy, we talked at our meeting that YuVonne also needs to look at her level of productivity. Currently she is averging [sic] 4.6 documents per day. YuVonne indicated that she thinks is [sic] reasonable to be producing 8-10 documents . . . on a daily basis.

Exhibit 5 to Memorandum In Support Of Defendant's Motion For Summary Judgment ("Defendant's Memorandum") (Doc. #30) filed November 2, 2005. Flaherty and plaintiff signed and dated the bottom of the e-mail. Flaherty reviewed plaintiff's work on a daily basis. She did not review the work of similarly situated employees.

On June 24, 2002, plaintiff received an unsatisfactory performance evaluation – the first unsatisfactory rating that she had received during her employment with defendant. The evaluation stated as follows:

> On May 2nd we met to review YuVonne's work from the period of April 10 - May 1. During this time period, a total of 65 documents were signed by Anne with a total of 16 errors . . . . During this time period, YuVonne was averaging 4.6 documents completed per day with an error rate of 25%. . . . The type of errors include: incorrect enrollment dates for both degree verifications and load [sic] deferments . . ., incorrect spelling of names . . ., sections of forms incomplete . . ., and including incorrect documentation to a verification resulting in the release of confidential information to another student (if this error had not been prevented by reviewer). * * *
>
> Letter templates were set up for YuVonne by Sara Honeck on May 14. Sara provided YuVonne with an instruction sheet and offered training to YuVonne. . . . YuVonne indicated that other errors were the result of her being distracted, failing to proof her own work, lack of concentration, and the need for new glasses. In addition, during our May 2nd meeting we reviewed the additional training requests by YuVonne . . . . We agreed that it did not make sense to continue with additional training and new duties until she successfully mastered this priority outcome. YuVonne has not been held responsible for completing the new duties assigned (other than ordering transcripts) to the Student Records

> Team as outlined in the April 29th training request. YuVonne indicated she feels comfortable with the transcript ordering process and did not feel Anne needed to review this work.
>
> During our May 2nd counseling session, a priority outcome was written to increase YuVonne's level of productivity to an average of 8-10 documents per day (degree verifications, certifications, and loan deferments) with an accuracy rate of 95% . . . . These levels of productivity and accuracy were established by YuVonne with Anne's concurrence.
>
> On June 10, we met to review YuVonne's work from the period of May 2-June 10. During this time period, YuVonne completed a total of 162 documents with an average of 6 documents per day. The error rate during this time period was 17% . . . . Errors made during this period were consistent with the errors made during the April 10-May 1 period. These errors included incorrect enrollment and graduation dates . . ., verifying an incorrect degree/residency . . ., incomplete forms . . ., incorrectly spelled names.
>
> Although YuVonne's error rate has decreased and productivity has increased, she is not at the level that she has self identified, and with which I concur, as an acceptable volume of work and accuracy. I am very concerned that the majority of errors in the work I have been reviewing is work that has been part of her job duties for the past four years. 80% of her previous job duties from her position description from the period of 1/5/98 to 9/14/01 . . ., prior [to] the office reorganization, include the duties I am currently checking. These duties include the verifying of M.D. degrees, residencies, and fellowships. Although YuVonne has the most experience of anyone in the office related to this type of work, she has not proven to be able to do this work successfully. In her current position description, this type of verification work that she is currently doing only accounts for 30% of her current job duties . . . .

Exhibit 6 to Defendant's Memorandum (Doc. #30). Dr. Dorothy Knoll, Dean of Students, reviewed, approved and signed the evaluation.

Plaintiff appealed this evaluation. On August 6, 2002, a three-member panel which plaintiff had selected conducted a hearing and unanimously upheld the unsatisfactory rating. The panel acknowledged that plaintiff performed adequate work in many areas, but ultimately found that "the presented facts supported the serious consequences of the errors involved" and endorsed the unsatisfactory evaluation.

Exhibit 7 to Defendant's Memorandum (Doc. #30).

Under K.S.A. § 75-2949d, a permanent employee in the classified service may be dismissed, demoted or suspended because of deficiencies in work performance. Such action may be proposed only after the employee has received two performance evaluations in the 180 calendar days immediately preceding the effective date of the proposed dismissal, demotion or suspension. K.S.A. § 75-2949e(b). Two consecutive unsatisfactory evaluations can result in a proposed dismissal, a proposed suspension without pay, a proposed demotion, or no action at all.

In September of 2002, plaintiff asked Flaherty what would happen if she received another unsatisfactory performance evaluation. Flaherty replied, "I think you know what it means." Affidavit of Yuvonne Pendelton, Exhibit 1 to Plaintiff's Opposition (Doc. #31) at 2. On October 8, 2002, Flaherty advised plaintiff that she would receive another unsatisfactory performance evaluation. The written evaluation stated that since the prior review, plaintiff had completed 390 documents with 55 errors. Plaintiff averaged six documents per day with an error rate of 14 per cent.[1] Exhibit 8 to Defendant's Memorandum (Doc. #30). Plaintiff did not formally receive the written evaluation.

Although no one specifically told plaintiff that defendant would terminate her employment if she received a second unsatisfactory evaluation, plaintiff believed that defendant would do so. After Flaherty notified her about the pending review, plaintiff met with Dr. Knoll and asked whether the university had other available positions to which she could be transferred. Dr. Knoll made a call and learned that the university did not have any positions available. Plaintiff then asked Dr. Knoll for permission to retire and

---

[1] These figures did not include errors on transcript orders because Flaherty did not begin to review that work until July 11, 2002.

for the second unsatisfactory performance evaluation to be kept out of her personnel record. Dr. Knoll told plaintiff, "we will just hold your unsatisfactory evaluation until after you decide if you're going to get another job or if you're going to retire." Deposition of Yuvonne Pendelton, Exhibit 2 to Plaintiff's Memorandum (Doc. #31) at 147. Based on this statement, plaintiff believed that defendant was going to terminate her employment and on November 15, 2002, she retired. When she retired, defendant had not made any decisions about how to deal with plaintiff's performance difficulties and it did not place the second evaluation in plaintiff's permanent personnel record.

On May 15, 2003, plaintiff filed a charge of discrimination with the Kansas Human Rights Commission, alleging that defendant had engaged in five discriminatory acts: (1) a written reprimand in January of 2002; (2) denial of training from January through November 15, 2002; (3) unsatisfactory evaluations in March, June and October of 2002;[2] (4) close scrutiny of her work; and (5) involuntary retirement. On May 10, 2004, plaintiff filed this lawsuit. In the pretrial order, plaintiff asserts the following:

> Plaintiff was denied the necessary training needed to perform her job at the University of Kansas Medical Center, Office of the Registrar. Other white employees, holding the same position and hired simultaneously or subsequently, were given such necessary training. As a result, plaintiff received an unsatisfactory employment evaluation. Plaintiff repeatedly requested she be provided with the necessary additional training. Her requests were of no avail. Plaintiff was put on notice that she would receive a second unsatisfactory evaluation. Feeling she was set up to fail, plaintiff was forced to retire.

Pretrial Order (Doc. #28) filed November 25, 2005.

Defendant argues that it is entitled to summary judgment because plaintiff cannot establish a prima

---

[2] The record here is confusing. The pretrial order and the parties' factual contentions in the summary judgment briefs do not contain any evidence from the March evaluation. Plaintiff filed a copy of the March evaluation with her complaint, but it reflects a "satisfactory" rating.

facie case of discrimination. Specifically, defendant contends that (1) plaintiff cannot show any adverse employment action, (2) plaintiff's decision to retire rendered moot the question whether she was qualified for the position, and (3) no evidence shows that it treated plaintiff less favorably than non-minority employees. Defendant next argues that if plaintiff has set out a prima facie case, it had a legitimate business reason for its action and plaintiff has not shown that its reason is pretext for discrimination.

## **Analysis**

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Disparate treatment analysis is applied to claims alleging the employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977). To prevail on her disparate treatment claim under Title VII, plaintiff must show that the discrimination complained of was intentional. In a Title VII disparate treatment case, plaintiff has the initial burden to make a prima facie showing of race discrimination by defendant. See Nulf v. Int'l Paper Co., 656 F.2d 553, 557 (10th Cir. 1981) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). Plaintiff satisfies this burden by presenting a scenario that on its face suggests that defendant more likely than not discriminated against her. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). The burden of establishing a prima facie case of disparate treatment is not onerous. Id. If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a "legitimate, nondiscriminatory reason" for the questioned action. See Nulf, 656 F.2d at 558. If defendant meets this burden, plaintiff must show that its stated reason is a pretext for prohibited discrimination. See id.

**I.     Disparate Treatment:**

    **A.     Prima Facie Case**

As to each claim of disparate treatment, plaintiff may make a prima facie case by showing that (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances which give rise to an inference of discrimination.³ Ammon v. Baron Auto. Group, 270 F. Supp.2d 1293, 1310 (D. Kan. 2003) (citing Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 1177, 1181 (10th Cir. 2002)).

        **1.     Adverse Employment Action**

Defendant does not dispute the first element – that plaintiff belongs to a protected class. Defendant first argues that plaintiff cannot show that she suffered an adverse employment action. As noted above, plaintiff alleges that defendant violated Title VII by refusing to train her, which resulted in an unsatisfactory employment evaluation and notice of a second unsatisfactory evaluation. See Pretrial Order (Doc. #28) at 5. Defendant argues that plaintiff did receive additional training, and that she was not required to perform duties for which she was not trained. Construing the facts in the light most favorable to plaintiff, however, plaintiff performed some duties for which defendant did not train her.

An adverse employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998); see also Meiners

---

    ³ Defendant contends that plaintiff must also show that she was qualified for the position. Because this case does not involve more common claims of hiring, firing or promotion, the Court applies alternative elements of the prima facie case and does not reach defendant's argument on this element.

-10-

v. Univ. of Kan., 359 F.3d 1222, 1230 (10th Cir. 2004). The Tenth Circuit liberally defines adverse employment action. See Sanchez v. Denver Pub. Schs., 164 F.3d 527, 532 (10th Cir. 1998). Such actions are not simply limited to monetary losses in the form of wages or benefits. Id. Instead, the Tenth Circuit applies a case-by-case approach, examining the unique factors relevant to the situation before it. Id.

Under some circumstances, failure to train may constitute an adverse employment action. See, e.g., Durkin v. City of Chicago, 341 F.3d 606 (7th Cir. 2003); Ryan v. Town of Schererville, Ind., No. 2:03-CV-530, 2005 WL 1172614, at *21 (N.D. Ind. May 4, 2005) (failure to train adverse employment action if employee denied training necessary for promotion). Contra Freeman v. Spencer Gifts, Inc., 333 F. Supp.2d 1114, 1129 (D. Kan. 2004) (refusal to train not adverse job action); Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 407 (5th Cir. 1999) (summary judgment proper when denial of training did not affect employment status or benefits). Here, plaintiff asserts that the failure to train resulted in unsatisfactory performance evaluations.

Plaintiff argues that her unsatisfactory performance evaluations constitute an adverse employment action. Citing Medina v. Income Support Div., 413 F.3d 1131 (10th Cir. 2005), defendant concedes that because two consecutive unsatisfactory evaluations could affect the likelihood that it would terminate plaintiff's employment, "it is probably not unreasonable to speculate that the Tenth Circuit might regard an unsatisfactory performance evaluation . . . as an 'adverse employment action.'" Defendant's Memorandum (Doc. #30) at 14. In Medina, the Tenth Circuit found that "[d]isciplinary proceedings, such as warning letters and reprimands, can constitute an adverse employment action." 413 F.3d at 1137. Defendant argues that plaintiff did not timely exhaust her remedies as to the June evaluation, however, and that she

never received the October evaluation.

As noted, defendant argues that plaintiff's evaluation in June of 2002 was a discrete act which could not form the basis for an actionable claim of discrimination because plaintiff did not file a formal charge on this event until after 300 days had passed. Under 42 U.S.C. § 2000e-5(e)(1) and 12 U.S.C. § 1432(a), plaintiff must exhaust administrative remedies with respect to each discrete act of discrimination by filing an EEOC charge within 180 days after the date on which the act occurred. Under 42 U.S.C. § 2000e-5(e)(1), an aggrieved person must file an EEOC charge within 180 days after the alleged unlawful act unless the person "has initially instituted proceedings with a state or local agency with authority to grant or seek relief from such practice." 42 U.S.C. § 2000e-5(e)(1). If a state or local agency possesses jurisdiction to grant or seek relief for the alleged unlawful employment practice, the EEOC will defer its jurisdiction to that agency, and the complainant will be allowed 300 days to initiate his or her complaint with that agency. 42 U.S.C. §§ 2000e-5(c) and (e); 29 C.F.R. § 1601.70; see Mascheroni v. Bd. of Regents, 28 F.3d 1554, 1557 n.3 (10th Cir. 1994). Otherwise, the complainant has only 180 days to file a formal EEOC charge. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002). This Title VII administrative exhaustion requirement runs separately from the date of each discrete act of discrimination. "A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it." Id. at 110. The time period for filing a charge is subject to equitable doctrines such as tolling or estoppel. See id. (citing Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982) (timely charge of discrimination not jurisdictional prerequisite to federal suit, but like statute of limitations is subject to waiver, estoppel and equitable tolling)). Such doctrines are to be applied sparingly. Id. at 110. Morgan abrogates the continuing violation doctrine

for claims of discrimination or retaliation, and replaces it with the rule that each discrete incident constitutes an unlawful employment practice for which administrative remedies must be exhausted. Martinez v. Potter, 347 F.3d 1208, 1210 (10th Cir. 2003) (discrete acts such as termination, failure to promote, denial of transfer or refusal to hire are easy to identify and constitute separate unlawful employment practices).

Here, the evaluations in June and October are discrete events. Plaintiff received the first evaluation on June 24, 2002. She filed the KHRC discrimination charge on May 15, 2003 – some 335 days after she received that evaluation. Plaintiff did not timely file her claim with respect to the June evaluation, and it cannot form the basis for an actionable claim.

Defendant also contends that the October evaluation cannot constitute adverse employment action because it never used the evaluation to alter terms or conditions of plaintiff's employment. Defendant's argument raises the question whether a proposed unsatisfactory evaluation can constitute an adverse employment action when plaintiff knows about the proposed evaluation, and plaintiff retires before she receives it, and defendant never places the evaluation in plaintiff's personnel file.

Defendant's position on this issue is without merit. Both parties agree that defendant prepared the potentially terminal evaluation and that plaintiff received notice of it. Flaherty and Knoll went so far as to sign the evaluation. Flaherty told plaintiff that she was going to receive it. The fact that defendant did not formally deliver it to plaintiff does not negate plaintiff's prima facie case. Essentially, plaintiff did receive an unsatisfactory evaluation – she just never received the written documentation. On these facts, the proposed evaluation was an adverse employment action.

### 2. Inference Of Discrimination

Plaintiff asserts that discrimination can be inferred because similarly situated non-minority

-13-

employees received training which she did not receive. See English v. Colo. Dep't of Corrs., 248 F.3d 1002, 1011 (10th Cir. 2001) (more favorable treatment of similarly situated non-minority employee raises inference of discrimination). To support this allegation, plaintiff offers her own affidavit, which does not set forth specific facts such as the identity or race of similarly situated employees, or how they received more favorable treatment. In deposition testimony, plaintiff specifically identifies Stephanie McKaig as a white employee who received training. Plaintiff cites no evidence that she is similarly situated to McKaig, however, and she does not establish what training McKaig received or how it differed from plaintiff's training. Furthermore, plaintiff makes no allegations regarding the performance evaluations of any similarly situated non-minority employees. Rule 56, Fed. R. Civ. P., requires that plaintiff set forth specific facts showing a genuine issue for trial. On this element, plaintiff has only offered her own conclusory affidavit and deposition testimony. Plaintiff has not set forth a prima facie case.[4]

### B. Legitimate Nondiscriminatory Reason

If plaintiff established a prima facie case, the burden would shift to defendant to articulate a legitimate, nondiscriminatory reason for its actions. See McDonnell Douglas Corp., 411 U.S. at 802. Defendant has done so in this case. Defendant asserts that plaintiff received unsatisfactory performance evaluations due to her error rate and level of productivity. Defendant supports this argument with numerous examples of documents on which plaintiff made errors. See, e.g., Exhibit 8 to Defendant's Memorandum (Doc. #30). Defendant states that it did not further train plaintiff because it did not require her to perform

---

[4] Plaintiff also contends that defendant treated plaintiff differently by reprimanding her for mailing a transcript to the wrong student's address. This allegation is not contained within the Pretrial Order (Doc. #28), and the Court does not consider it.

any duties for which she was not trained and it focused on improving her error rate on the 30 per cent of her job responsibilities for which it held her responsible. Even if plaintiff had demonstrated a prima facie case, defendant has sustained its burden of articulating a legitimate, nondiscriminatory reason for its treatment of plaintiff.

### C. Pretext

Where defendant articulates a facially legitimate reason, the burden shifts back to plaintiff to present evidence that defendant's proffered reason is pretextual, that is, "unworthy of belief." See Bausman v. Interstate Brands Corp., 252 F.3d 1111, 1120 (10th Cir. 2001). Plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted). A plaintiff can further show pretext with evidence that (1) defendant's stated reason for the adverse action was false; or (2) defendant acted contrary to its policy or practice when making the adverse decision. See Kendrick v. Penske Transp. Srvs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000). Evidence of pretext may also be shown by disturbing procedural irregularities. See Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1217 (10th Cir. 2002).

Defendant argues that the record contains no evidence from which a reasonable jury could conclude that its stated reason for not providing adequate training or giving plaintiff an unsatisfactory evaluation is pretextual or unworthy of belief. Plaintiff argues that she continued to improve in her work yet did not succeed because she did not receive training and Flaherty continued to scrutinize her work. This argument simply reasserts plaintiff's allegations and falls well short of showing that defendant's reasons for its actions

are pretextual. Even if plaintiff had set forth a prima facie case, she offers no evidence of pretext.

## II.     Constructive Discharge

A constructive discharge exists when an employer's illegal discriminatory acts make working conditions so difficult that a reasonable person would feel compelled to resign. Garrett, 305 F.3d at 1221; Phillips v. Moore, 164 F. Supp.2d 1245, 1256 (D. Kan. 2001); Redpath v. City of Overland Park, 857 F. Supp. 1448, 1464 (D. Kan. 1994) (citing Derr v. Gulf Oil Corp., 796 F.2d 340, 344 (10th Cir. 1986)). The question is whether the employee had any other reasonable choice but to resign in light of the employer's actions. Tran v. Trs. of State Colls., 355 F.3d 1263, 1270-71 (10th Cir. 2004) (citations omitted).

Here, plaintiff alleges that notice of the proposed second unsatisfactory performance evaluation placed her in a position where she felt compelled to retire before defendant terminated her employment. Under K.S.A. 75-2949d and 2949e(b), a permanent employee in the classified service may be dismissed, demoted or suspended because of deficient work performance after two unsatisfactory evaluations within 180 days. On the other hand, two consecutive unsatisfactory evaluations could also result in no action all. Pretrial Order (Doc. #28) at 3. While plaintiff believed that defendant would terminate her employment, she testified that termination was not the only option and that they "could have worked it out." Affidavit of Yuvonne Pendelton, Exhibit 1 to Plaintiff's Opposition (Doc. #31) at 126. Plaintiff decided to retire before defendant made any decision regarding her employment status based on the October evaluation. On these facts, the Court cannot conclude that plaintiff had no choice but to retire. See Garrett, 205 F.3d at 1222 (defendant did not constructively discharge employee who resigned before receiving complete details about job transfer).

**IT IS THEREFORE ORDERED** that defendant's Motion For Summary Judgment (Doc. #29) filed November 1, 2005, be and hereby is **SUSTAINED**.

Dated this 11th day of January, 2006 at Kansas City, Kansas.

s/ Kathryn H. Vratil<br>
Kathryn H. Vratil<br>
United States District Judge